Good morning, Your Honors. Good morning. Paul Kamaroff for the Appellant T. G. Madam Clerk, I'd like to reserve three minutes of my time for rebuttal. Your Honors, this case stems from a federal court case where, with all due respect to Judge Riel, there are a bevy of significant procedural errors committed by the local court. The first significant concern we'd like to address is Judge Riel's two orders whereby he excluded the record of the very case, the case that we refer to as Case No. 2, from being reviewed by his court. This, of course, is contrary to the federal law, which mandates that the reviewing court shall receive the record of the administrative review process that's being appealed. Moreover, this court in Dean v. Trans World Airlines found that the exclusion of automatically admissible evidence is reversible procedural error. Now, this significant issue was brought to the court's attention three times. First, Judge Riel ordered on his own to exclude the record from Case No. 2. Following that first order, the parties engaged in four different meetings for exchanges to come up with a stipulated agreement to submit Case No. 2. Unfortunately, the appellee refused to include the entire record, official record, in Case No. 2. Was Dr. Brown's emotional disturbance diagnosis, was that at all in the first administrative record? Your Honor, very good question. Of the 290... Could I have the question repeated? I didn't hear what you said. I'm sorry. I asked if Dr. Brown's diagnosis of emotional disturbance was included in the first administrative record that the district court had received. Your Honor, no. It was not. Your Honor, of the 290 pages for Case No. 2, of the official record for Case No. 2, only 259 pages were not received by Judge Riel. Once again, he excluded 259 pages of a 290-page record, in addition to medical Dr. Brown's May 7, 2009 letter, whereby he diagnosed the student with an emotional disturbance the very first time. Now, this was based on the student becoming more frustrated, less receptive to intervention techniques. This letter was provided to the school district at the May 12, 2009 IEP, which by itself, under Adams v. Oregon and a plethora of California education codes and the IDA, is its own separate legal incident. What did they do at the individualized meeting? They certainly did not address the student's present unique needs. Now, under the Hellsgate analysis, a letter from a medical doctor with a new diagnosis, by itself, is a new fact that triggers significant legal responsibility. Especially when it's an emotional disturbance diagnosis, isn't it? I agree, Your Honor. It's not just any fact. It's this diagnosis you thought was important. I agree, Your Honor. Let me ask you another question, having agreed, unless you have something you specifically want to say to him. I don't want to interrupt your answer. If I can add, the 19-page psychoeducational report from licensed clinical psychologist Dr. Kerry Dilley, which was performed in June 2009 before case number two was filed, which independently corroborated Dr. Brown's diagnosis and independently made a recommendation for this student to be sent to the County Mental Health Agency. She made a separate referral for an AB 3632 referral. That also was not received by Judge Riel. Also, my point that I was getting to, the May 12, 2009 IEP, which is, of course, the crux of case number two, was also not received by Judge Riel. Those three important documents were part of the 259 pages not received by Judge Riel. This, of course, unduly prejudiced the student. Essentially, Judge Riel was making a factual determination as to whether or not the issues and the facts and circumstances from case number one and case number two overlapped without looking at the facts and evidence from case number two. Let me ask you this question, which was my question. If, in fact, we agree with you that the district court erred in dismissing the claim based on race judicata or that he erred in dismissing based on collateral estoppel, do we really need to reach whether he erred in refusing to receive the record? Your Honor, I think there are various reasons. I said, do we need to? I don't need all the reasons. It's either yes or no. Do we really need to reach that if we believe that he erred in the race judicata ruling and also in the collateral estoppel ruling? No, Your Honor. I would submit that the very important issues in this case stem from the race judicata and collateral estoppel being misapplied to this case. On the race judicata, Dr. Brown's diagnosis wasn't in the first administrative hearing. That is correct. And so is that your best argument as to why race judicata would not stop your ---- Your Honor, I think based on the Adams v. Oregon snapshot rule that each IP, which is held periodically, must look at the disabled child's present unique needs. That letter, under the Hellsgate analysis, changed the child's present unique needs. That was a new fact, that was a new circumstance, which literally didn't exist in time when Case No. 1 was heard. Keep in mind that Case No. 1 was filed in the first week of August 2008. This diagnosis occurred May 7, 2009, which then ---- What school year did the first one deal with? That was the 2008-2009 school year with some carryover issues from the 2006-2007 school year. That's because he was being weaned from drugs? Is that what you're referring to? Essentially, the school had offered another day placement. This child had been in on day placements for 13 years. The student wanted to try a medically-based, autism-based home program. They did try that. The administrative law, Judge Dugan, permitted this medical treatment to occur. After this was provided, it didn't work. So it's not atypical. In fact, it's proper when a course of therapy that's anticipated to work doesn't work, for the medical doctor to go back and reexamine. In this case, he came up with a brand-new diagnosis. Now, there's ---- It's my understanding that the first decision was about an immediate placement for the 2008-2009 year, right? Yes. And it's my understanding that nobody in that litigation sought an order relating to the 2009-2010 year? That's correct. It would have been improper to do so. Now, the 2008-2009 school year had not yet begun when Case No. 1 was filed. To contemplate the 2009-2010 school year would be in conflict with Adams v. Oregon, which requires the IP team to review the present unique needs of the student. So what we have here, essentially, are different school years being conflated, the 2008-2009 school year in conflict with the 2009-2010 school year. You've got different IEPs, which time and time again this Court has determined is a separate legal instance, like a different car crash. So you've got the June 2008 IEP that led into the July 21st 2008 IEP offer, that then the consequence of which became a Case No. 1, which was filed the first week of August 2008. That's a separate legal incident. From that legal incident, you had happening different legal issues. Then later in time, you've got a new IEP relating to a new school year pertaining with regard to happening different legal issues being conflated together. That's highly improper. There's also been a distortion as to one of the significant legal issues that was brought in Case No. 2, and that was the student's request for an expanded IEP team. This request doesn't automatically trigger a different placement. What this request does, importantly, is it triggers interagency attachment, responsibility, in this case from the Los Angeles County Mental Health. They're going to conduct their own assessment. Now, under the CCR, at that point, they've got to, they shall offer less restrictive services or consider less restrictive services to an ROTC placement. So this request, although it, legal term of art, is a request for an expanded IEP team meeting to consider an ROTC placement, there's nothing automatic about changing the placement. The only automatic trigger that the student was seeking was more help. Keep in mind, there had been a pattern of this school district denying this student educational and disability rights, which led to Case No. 1, and unfortunately led to Case No. 2. The student wanted more help, in this case, from mental health professionals. This is a brand new, patently different issue. The term expanded IEP team meeting simply does not exist in Case No. 1. With regard to another concern, and that was the amended complaint from Case No. 2, we believe that's also been distorted. We feel that Judge Riel's determination that there was, and I think he said no evidence, that the amended complaint had been accepted by the OAH, the court at hand. Let me make an argument suggestion to you. I think it's more understandable if you don't use acronyms for some of the ones you've used. I deal with these cases occasionally, but certainly not to the degree you do, so I encourage you to not use them. I apologize, Your Honor. The Office of Administrative Hearings is the court where the due process hearing is held. These are informal due process hearings. Now, the California Education Code, 56505E6, permits the amending of issues informally, simply by informing the other side at least ten days before the actual due process hearing. In this case, the initial complaint that's been filed was July 21st, 2009, pertaining specifically to the 2009-2010 school year. On August 7th, the school informed the appellee of amending the issues. This was 43 days before the due process hearing was scheduled. This is also the exact same manner that the appellee amended their complaint in Case No. 1. They filed their initial complaint on August 6th, I'm sorry, August 1st, and they amended it August 6th, not with the motion, not with the leave to amend, but by simply informing the other side more than ten days before the due process hearing, pursuant to California Education Code, 56505E6. This is the normal procedure of the office administrative hearings. They don't require more formalized amendment processes. The only way that we know the Court accepted it, just like in Case No. 1, we know that the Court accepted the amended complaint from the appellee, is it's part of the official record. Well, guess what? In Case No. 2, we also have an official record, 290 pages of an official record, and the amended complaint from the student includes, I'm sorry, the official record includes the amended complaint from the student. We also obtain a declaration from the Court itself, from the person who compiles the official record, saying this amended complaint is part of the official record. So to wrap up very quick, you've got a conflation of different school years, different IEPs, and patently different legal issues that have denied, have barred the student a trial, a trial in the office administrative hearings, now a trial in Federal court. We find this to be extremely prejudicial to the student. I'm going to reserve the rest of my time for rebuttal. Thank you. Thank you. Good morning, Your Honors. Excuse me, Jeff Martirosian for the Baldwin Park Unified School District appellee in this matter. Judges, I know this is not an internet class action case, but it is a significant case. It's an example of a litigant who refuses to acknowledge an administrative law judge's decision, and rather than appeal it, fires new counsel in an attempt to circumvent the decision. The case begins and ends with administrative law judge Castillo's ruling that collateral estoppel applied. What is ALJ Castillo faced with when he makes that ruling? He's faced with a 25-page decision in case number one, and he's faced with a complaint, a due process complaint in case number two. He's also faced with a motion to dismiss case number two based on race, judicata, and collateral estoppel. That is the totality of what ALJ Castillo. What school year did case number one deal with? Case number one involved a number of years through 08-09 initially. But as a result of testimony by two of the plaintiff's experts, both Dr. Brown and Dr. Guyer, they testified at length about the medication program that the student was undergoing, and they testified, as did Mother, that if placement's going to be changed, it should be changed sometime after June of 09. The school year's over in June of 09. And Judge Dugan, in the 25-page case number one decision, said, yes, I understand. I think that that is a good point. Medication is an important issue, and, therefore, I'm going to defer implementation of moving to Canyon View School until August, just a few months later of 09. And that is the commencement of the 09-10 school year. So as a result of the request by student's counsel that the decision be deferred until August, that caused the case to affect and deal with 09-10. It may have affected. I guess had there been a psychologist or a physician's diagnosis of this emotional disturbance before the round one, I mean, there was obviously some symptoms that pointed that the child was emotionally disturbed, but had there been a specific physician or psychologist's diagnosis of that condition in the first round? Dr. Brown was an expert witness in case number one, testified for hours about the aggressive behavior of the student. Did he give that diagnosis? No, he failed to. And that's part of the basis for our argument below was that they had an opportunity, as the case law talks about, the Clemente case. When you have an opportunity to present an issue and you fail to, you're foreclosed from bringing up the issue. That is the same issue. You can't claim that an issue is different when you neglect to put forth evidence. You had the same witness testify at length. He's been a treating physician for 18 months, and you wait until one month after the decision in case number one is final to now bring him forward in a six-paragraph letter sent to the district on May 8th, 2009, one month after the decision is final, saying, in my opinion, the student qualifies as emotionally disturbed and, therefore, I believe a residential treatment center is required. That's what the district was faced with, again, a month after the decision is final. And the student's council is requesting a placement that is completely contrary to the decision of just three months ago in January of 2009. And so isn't that really, I can appreciate your argument and, in fact, understand the arguments that are being made, but isn't that exactly what the second hearing then is about? If there's been a new diagnosis of serious emotional disturbance for the first time after another decision has been made and the doctor has testified and he said what he had to say but he didn't quite get to that point, isn't that what the second hearing then is about since we're going on into the 2009-2010 year as to whether we have to adopt that decision or whether it's out to lunch or whether that's the decision we ought to go with since we're going into other years? That's the problem that I have with this particular matter in that it seems like we're talking about different years and now we're talking about something they say is a new diagnosis, but a little bit skeptical one might say I didn't say enough last time so I'm going to increase the diagnosis to get more. But that's what these are about. The next hearing is about that. Please respond to that because that to me is the big problem. The case number one says placement in August of 2009. I know. Has to be at Canterbury School. Do the parties have the ability to now disregard that order? No. Well, they can't disregard the order as to that, but if they have now another diagnosis that is different than for going on in further years, doesn't that seem to be the next thing we argue about? Not when placement has been determined to commence in 09-10. Sure. Well, but placement wasn't determined for 09-10. Placement was determined for 08-9. But based on counsel's argument that implementation be deferred, we have placement that begins in August. Had that argument not been made, then Judge Dugan's order would have been Canyon View School, you've got to start going to it 30 days later. Instead, we didn't have that in deference to the arguments about this medication management. So we have a decision that's binding on the parties. We have a letter from a doctor. It's not an assessment. Government Code Section 7572.5 requires an assessment of emotional disturbance to invoke this expanded IEP. That's not an assessment. Oh, yes, a month and a half later, after the infamous May 12 IEP meeting, they go out and they get a doctor to perform an assessment, and then they throw it in a motion for summary judgment that they file in case number two just three days after the filing of the complaint. I think Judge Smith's question was going to, is that a question more of weight than of race judicata? Let me pose a hypothetical. Say you have a particular diagnosis that's going to cover the 08-09 school year, and say in December of 08, for one reason or another, a doctor comes up with a completely new diagnosis, one that would otherwise qualify for different treatment. Are you arguing that the fact that there had already been a determination on the 08-09 school year would stop the ability of that student or the student's parents to seek an additional review for the new condition? Absolutely. If the new diagnosis is based on the same facts, if something has happened to the student, there's a car accident and the student is now in a traumatic situation where he's going to qualify under special education under a different qualification, those are truly different facts. But when you simply have a new diagnosis based on the same aggressive behavior, that's a manipulation of the process. That's just evidence that you should have gotten in case number one. And you decide through new counsel to go seek out a new opinion based on the same facts. Well, in this case, was the weaning off this psychotropic medication, was that something that would have had to been, was that important in making the diagnosis as to how emotionally disturbed the child was? We don't know. In other words, did the doctor at all say that I had hoped that the medication coming off it, he wouldn't have certain symptoms, but at the end of the medication, it turns out that the symptoms have gotten worse? Now, counsel's letter that included Dr. Brown's letter to the district that ultimately was reviewed at the May 12, 2009 IEP. Again, it's six short paragraphs. It talks about the increasing aggression. It mentions multiple medication trials and goes on and renders an opinion that he believes that the student is now emotionally disturbed, having treated him for 18 months and having five months before testified in a hearing that took six days long and had 19 witnesses testify about a range of issues. We had hundreds of pages of testimony on the aggressive behavior of the student. And so to now take that aggressive behavior and go to a trial witness and say, hey, does this constitute emotional disturbance? When you could have done that at the previous case that's simply improper and that's exactly what the Clementi case talks about, you could have and should have presented the evidence in case number one. Brown's note talks about the behavior declining, doesn't it? Yes, no question. There's no question that his opinion, again, not an assessment, his opinion, was based on the fact that there was an increase in aggression, in his estimation, over the past three or four months. So we're not dealing with a long period of time here, but we are dealing with a student who by everyone's admission, and in fact it's in the complaint in the district court, has a history, a long history of aggressive behavior. And so we have a student with a long history of aggressive behavior. We go to a trial witness who now takes that and puts that aggressive behavior into a box called emotional disturbance in an effort to seek a different placement. The district is sitting there saying, okay, we have to wait until September to get this kid into a school. Excuse me, August of 2009. And after all, he had been at home for two years. The district started this whole process of filing for due process in case number one because they're trying to get the kid out of the home, and they needed to get in a setting with other students, in a real special education setting. However, there were rights the district, and if you will, benefits the district gets from the decision they had for the 08-09 year. The 08-09 year and the decision from the ALJ would suggest that the parent would not be able to now come back and suggest they needed money for doing what they did at home because they didn't get an adequate FAPE in that particular year. The district would be able to say, got my judgment. I'm not going to give you those benefits. So now here we are for the next year. And, yes, I appreciate, and I'm just trying to look at this as I've seen it from time to time. The next year you have a different diagnosis. You can argue same facts, but a different diagnosis for a new year. And all you're saying is because you haven't said that any other year, you can't say it for the new year. Again, I'm trying to figure out what it is the district loses because the district gets the benefit of the prior decision, gets benefits for having the prior decision. All we've got to do is make a decision in the next year based on a different diagnosis, maybe similar facts. You suggest they're similar, they don't. But nonetheless, the same thing comes up. And this is all happening just a month before the student is to start school. In fact, he never does go to school. I understand. And so we're faced with a situation through years of litigation after a ruling in case number one where a student is supposed to start at Canyon View School, and a month before they file for due process claim that he should go to a residential treatment center and never, ever start school as was ordered. And so it's a situation where, and I think it's important to look at the timing. If this is a year later and it's a different factual pattern, a traumatic injury involving truly new facts, that's one thing. And that's where the parties would have to get together and modify the educational program. But when you're dealing with a student who has been diagnosed with autism since age three, who is 16 years old, now almost 19, and this autism, while the student is getting bigger, and because he's getting bigger, there is aggression going about. And that aggression was testified about in the hearing at length. It's the same facts. You can't just take the facts and create a new theory and say that a new theory is new facts. As the courts have said, new theories are not new facts. Indeed, the Evans case, which we cited in our brief, is a classic example of counsel's efforts to seek new evidence. That was the personal injury case where the defendant prevailed in this case, in a personal injury case. The plaintiff dies. A year later, an action is brought based on the death of the plaintiff. And in the interim, the biopsy report of the plaintiff's lungs is put forth as new facts, just as in this case, new medical opinion. And the court said no, no. These are just new theories and new evidence. These are not new facts. Thank you. We've heard your argument, and I think we understand it. Your time has elapsed. Thank you, Your Honor. Your Honor, I've got several concerns I'd like to raise. First and foremost, this Court's already determined that a new diagnosis is not a new legal theory. It's a new fact which triggers new legal duties. In Weisberg, the student had been diagnosed with mental retardation for years. He was later diagnosed with autism. That wasn't a new legal theory as to the appropriateness of past I.E. keys for past school years. That was a fact which created new legal duties for that student going forward. In Hellsgate, the student had been diagnosed with a speech and language impairment for years and was later diagnosed with autism. That wasn't a new legal theory with regard to past legal issues. It was a fact that changed the legal status between the parties going forward. Here we've got a diagnosis of emotional disturbance which took place after a medical doctor, Dr. Brown, had tried this medically-based program, and it didn't work. Before this, the school tried 13 years of autism-based school programs, private and public, and that didn't work either. And his letter clearly states, we tried the medical program, and it didn't work. The child's getting more frustrated and less receptive to these therapies. It's a new diagnosis. That is proper and typical of what a medical doctor does when a course of therapy doesn't work. It's also permitted in Hellsgate and Weisberg. And also, an important note, L.J. Dugan did not order placement for the 2009-2010 school year. She couldn't have. That issue was not actually litigated during the case at Case No. 1. She used permissive language. The school may provide this placement for the 2009-2010 school year. The Supreme Court found in JAMA v. Immigration and Customs Enforcement that the term may and shall are using contrapositions to each other. Now, when it came to the compensatory education with regard to the 2008-2009 school year, she used the term shall. The school shall provide compensatory education. When it came to the issue that was never litigated during Case 1, placement at Canyon View School, another day placement, autism-based placement, for the 2009-2010 school year, she intentionally used the term may, which is permissive at best and can be considered as illusory. She did not intend to conflict with Adams v. Oregon, which demands, requires, that the later IPT meetings look at the child's present unique needs, including present diagnosis at the time of that IP meeting. There are different school years. There are different facts. There are apparently different legal issues. The application of res judicata cladro estoppel is highly improper, and that's reversible error. Thank you. Thank you very much for your argument. Both sides. Thank you very much. Appreciate it. Case 10-56154, T.G. v. Baldwin Park Unified School District is submitted. Thank you all for your arguments today. Court is adjourned. Thank you. Thank you.
judges: Gwin, Fletcher B. , Smith N. R.